## THE E. HEIPERSHAUSEN.

## THE RICHMOND.

### REILLY et al. v. THE E. HEIPERSHAUSEN and THE RICHMOND.

#### (District Court, S. D. New York. April 17, 1893.)

TUGS AND TOWS — WHEN HELPER NECESSARY — ANCHORAGE GROUND — NEW YORK HARBOR—IMPROPER ANCHORING.

A tug, starting up the North river with a long tow, perceived, half a mile ahead of her, the lights of a vessel, which was anchored nearer the channel than permitted by the regulations of the secretary of the treasury. Other vessels preventing the tug from drawing across the river, libelants' boat, in the last tier of the tow, struck the anchored vessel, and was sunk. *Held*, that the vessel at anchor was in fault for lying outside of the prescribed anchorage ground, but so also was the tug in charge of the tow, for not sending her helper back to push the tow out of the way of the anchored vessel, whose unlawful position, and the difficulty of taking so long a tow past her, were seasonably recognized.

In Admiralty. Libel by F. Reilly and another against the steam tug E. Heipershausen and the steamship Richmond for collision. Decree for libelant against both vessels.

A. Cameron, for libelants.

Carpenter & Mosher, for the Heipershausen.

Owen, Gray & Sturgis, for the Richmond.

BROWN, District Judge. The libelants are the owners of the canal boat Thomas Flack. About 9:30 P. M. of June 10, 1892, the canal boat was the outer boat on the port side of the ninth and last tier in a flotilla of canal boats going up the North river with the flood tide, in tow of the tug Heipershausen, on a hawser of about 90 fathoms. The libelants' boat, with some others, had been put into the tow at Hoboken, and the tug was heading up river and a little off from the shore, going up about 400 feet off Castle point. The white light of the Richmond was then observed by the pilot about half a mile above him in the river, and apparently about in the same line of the channel way. The tug and her helper, the Haviland, put their wheels hard a-port or nearly so and hauled to starboard, which caused the tow to head somewhat across the river. About abreast of the Richmond on the New York side were some war vessels, which, it is said, compelled the tug, when she came near them, to head up river, which she then did, passing about 50 feet from the nearest. The result was that the libelants' boat

ran upon the anchor chain of the Richmond and was thereby knocked out of the tow and soon after sunk. The above libel is to recover the damages.

The principal controversy in the case relates to the position in which the Richmond was anchored. The anchorage ground prescribed by the secretary of the treasury directs vessels in that region to anchor west of a line drawn from Castle point to Bull's ferry. By the tug it is claimed that the Richmond was several hundred feet to the eastward of that line; while the Richmond contends that she was properly anchored to the westward of it.

The weight of testimony is that the Richmond was anchored somewhat to the eastward of the prescribed line. The means employed for locating the Richmond's proper place by the tug that towed her there, viz. by bearings off the port bow and starboard quarter, were devoid of accuracy and were naturally deceptive; and the method employed by the master would give but a rough approximation. The method of the witnesses for the Heipershausen, viz. by putting their tugs in the range of the two points, was much more exact, and was sufficient to leave no doubt that the Richmond was somewhat to the eastward of the prescribed line; though the distance of the Richmond to the eastward may have been considerably overestimated. The testimony of the diver who located the wreck is, doubtless, the most exact of all; and he testifies that the wreck as it lay sunk was from 40 to 50 feet to the eastward of the prescribed line. The flood tide at the stage of tide when the canal boat sank, sets somewhat towards the westerly shore, and must have carried the canal boat with it as the boat went down. There is doubt upon the evidence just where the boat sank in reference to the Richmond; but as the Richmond must, also, have swung some to the westward by an angle of one or two points, I have no doubt upon all the evidence that her anchor was probably dropped 50 or 100 feet to the eastward of the prescribed anchorage ground.

There is no doubt that this breach of the regulation contributed to the collision. The steamer had taken her position about 4 o'clock in the afternoon of the same day, and was not known to the pilot of the tow. Her position rendered it somewhat difficult to avoid the swing of long tows going up with the flood, or coming down with the ebb. While the encroachment by the steamer on the navigable space was not great,—probably not above 100 feet,— I have no right to disregard even this encroachment as immaterial. Had she been in the proper place, the collision would not have occurred. Unless adherence to the official line be enforced, there is no other line that can be adopted, without introducing far greater uncertainty, and consequent injustice.

The evidence, however, further shows that the tug cannot be wholly absolved from blame, in not making use of the means at her command to avoid the danger that was apparent. According to her own pilot's testimony, the faulty position of the Richmond was seen half a mile below, and she was judged by the pilot to be even much further to the eastward of the prescribed line than she really

was. The presence of the vessels on the New York side was also equally visible, and the set of the flood tide to the westward at that stage of it was also known; and these circumstances increased the difficulty of taking so long a tow through circumscribed limits. The entire length of the flotilla, including the hawser and the tug, was between 1,600 and 1,700 feet. The Heipershausen had a helper, the Haviland, alongside. She was subject to the orders of the Heipershausen. It is a very common thing, under such conditions, to detach the helper and send her to the stern of such a long tow to push it over and keep it out of danger. When the tug Pocahontas with her tow came down with the ebb tide and noticed the position of the Richmond, the helper tug, of her own motion and without the orders of the master and the pilot, perceiving the necessity, remained by the stern of the tow, instead of going forward as she intended, and by shoving off, avoided a collision which would otherwise have ensued. The same thing was done in going up. Although the neglect to take this precaution on the part of the Heipershausen was to some extent, no doubt, an error of judgment, and much less blamable than the fault of the Richmond in anchoring beyond the prescribed limits, still the policy of the law, which, to prevent the destruction of the property and life of innocent parties, enforces careful navigation and the avoidance of risks by the use of all reasonable means to avert collision, does not permit the acquittal of the Heipershausen in this case; because the circumstances as seen and recognized indicated danger, and her pilot had no right to omit the use of any of the customary precautions which were available to him to make sure of averting this danger. Both must, therefore, be held liable, and the libelant is entitled to the usual decree against both, with costs.