THE PASSAIC.

(District Court, N. D. New York. October 19, 1896.)

1. COLLISION—TOW WITH ANCHORED VESSEL—MUTUAL FAULT.
   Where a schooner engaged in removing a wreck from the St. Clair river, near Lake Huron, was struck on a dark, squally night by the hindmost of two barges in tow of a steamer coming down the river, *held*, that both the steamer and the schooner were in fault,—the former for not keeping well over to the Canadian shore, where there was sufficient room to carry her tows by in safety, notwithstanding a cross current aided by the direction of the wind; and the latter for remaining anchored on such a night directly in the path of navigation, and especially for being so attached by two anchors that it was impossible to shift her position after the danger was discovered.

2. SAME—WRECKING VESSEL—ANCHORING IN CHANNEL.
   A vessel engaged in removing a wreck from a river is not justified, by any considerations of mere convenience or loss of time in shifting her position, in remaining at anchor directly in the path of navigation on a dark, squally night, when the wind and current are setting diagonally across the channel.

This was a libel by the owners of the schooner Ben Hur against the steam barge Passaic and her tows, the barges Elma, Hattie, Jenness, and Superior, to recover damages for a collision which resulted in the sinking of the Ben Hur.

H. D. Goulder and P. H. Phillips, for libelant.
John C. Shaw and Harvey L. Brown, for respondents.

COXE, District Judge.	The testimony in this cause is exceedingly voluminous, the arguments alone occupying two days.	It is manifest that any attempt to discuss all the propositions debated will extend this decision beyond reasonable limits.	I shall, therefore, confine myself to a statement of the conclusions reached and to as brief a recital as may be of the reasons therefor.

The collision occurred on the St. Clair river, a short distance below Lake Huron, at about half past 5 in the afternoon of Saturday, November 8, 1890.	The schooner Ben Hur had for some time prior to that date been engaged in working upon the wreck of the schooner Tremble.	The Tremble was lying at the bottom of the river about 200 feet from the west bank directly in the track of navigation.	The wreckers had succeeded in getting chains around the stern of the Tremble.	These chains were held up by the Algoma, a small scow, which was held in position directly over the wreck by the chains in question, by a line attached to one of the Tremble's spars and by lines to the stern of the Ben Hur which were hove taut by a steam winch.	The Ben Hur was anchored 70 feet above the Algoma by

two anchors, the port anchor being at the end of a long chain almost dead ahead and the starboard anchor being located nearer the center of the river, the chains lying at an angle of about 45° and being about 600 feet in length.

Early in the afternoon in question the steamer Passaic, having four unloaded barges in tow, passed up the river and into the lake. The weather conditions were so unfavorable that the master of the Passaic concluded that it was unsafe to navigate Lake Huron, and so, after proceeding a few miles, turned about and proceeded down the river, intending to tie up for the night at Port Huron. The last barge in the tow was the Superior. The other barges passed the Ben Hur in safety, but the Superior struck her on the port bow inflicting a wound which caused her to sink directly over the wreck of the Tremble.

The river at the point in question is about 1,430 feet wide and is navigable from shore to shore. The current sets over towards the American shore. It runs about six miles an hour and is known as the "St. Clair Rapids."

The wind was blowing fresh from the northeast.

The Passaic and tow were coming down the river at the rate of 12 miles an hour past a given point. Although it was dark, objects were discernible at a considerable distance. There were five lights on the Ben Hur and the other vessels carried the lights required by law. About 1,500 feet below the point of the collision and nearly opposite the "Waterworks" a shoal sets out from the eastern bank and extends several hundred feet into the river. The witnesses differ both as to the length and width of the shoal.

The dimensions of the various vessels concerned in the collision are as follows:

The Passaic is 200 feet in length and 35 feet beam.

The Ben Hur was 130 feet in length and 25 feet beam.

The Superior is 145 feet in length and 26 feet beam.

### The Barges.

The barges had no means of propulsion of their own and were entirely in the control of the Passaic. The only serious accusation against them is that they failed to shorten their tow lines before coming down the river, but the testimony against them is vague and doubtful and is successfully overthrown by the crews of the barges who testify that at the proper time they shortened their lines to the customary length. The libel against them must be dismissed.

### The Passaic.

I am convinced that the collision occurred through the joint negligence of the Passaic and the Ben Hur.

Without attempting to locate the precise course of the steamer down the river I am convinced that it was entirely possible for her to tow the barges past the Ben Hur in safety. The master of the steamer knew of the position of the Ben Hur. He saw her anchored near the wreck when he passed up only a few hours before. He

knew, or should have known, the width of the channel, and, with the wind and current tending to drive his tow towards the American side, he should have kept as far as possible towards the Canadian side. Had he done so a collision would have been well-nigh out of the question.

The weight of the testimony is to the effect that he passed the Ben Hur considerably west of the center of the channel, that the tow, though not in perfect alignment, was following in the customary manner and that, had he taken a course a few hundred feet farther to the eastward, the Superior would easily have avoided the collision. It was not necessary for him to take the extreme easterly course; any of the usually traveled courses east of the center would have enabled him to pass in safety. With such a tow as the Passaic then had the stern barge should not drift to leeward more than three or four hundred feet. When it is remembered that there was, at least, 800 feet of navigable water between the Ben Hur and the Canadian shore, it will be seen how easily, with proper care and precaution, the accident might have been avoided.

I cannot credit the statement of some of the expert witnesses of the respondents that the circumstances were such that it was impossible for the Passaic to avoid a collision. If, however, they are correct, the master of the Passaic is hopelessly condemned. Any course was better than to run into inevitable disaster. He knew exactly where the Ben Hur lay and if it were impossible to avoid striking her he should not have come down the river at all.

It is said that it would not have been safe for him to remain in the lake or practicable to signal for a tug. Between two courses, one involving inconvenience and possible danger and another involving certain danger, he should not have taken the latter. In view however, of the immense commerce which is continually passing up and down the St. Clair river the proposition that it is impossible for a tug and tow of four barges to pass a vessel anchored 200 feet from the American shore without a collision will probably be regarded as unique by a vast majority of the experienced mariners on the lakes.

It is entirely clear that the master of the Passaic navigated without sufficiently considering the position of the Ben Hur and the character of his tow. The conditions surrounding him made the utmost caution necessary: That he was not particularly solicitous for the safety of his tow is demonstrated by the fact that he knew nothing of the collision until he stopped at the dock at Port Huron.

## The Ben Hur.

Considerable testimony has been taken to show that the Ben Hur might have avoided or lessened the force of the blow by shifting her position after the collision was imminent. I am convinced that she could not have done so. It was then too late. Even could she have foreseen danger when the Passaic passed the upper dock the time would have been inadequate. But the Passaic passed upon the usual course and there was no reason to apprehend, at that time, any unusual maneuver on her part. The Ben Hur was fast bound, head and

foot, as immovable, for all practical purposes, as if she had been a rock in mid-channel. When it became apparent that the Superior would strike her she was powerless to help herself.

Her negligence antedated the first appearance of the Passaic on her downward voyage. Her fault was in being, on such a night, so tied up that it was impossible to move her.

Concede that she might rightfully anchor near the Tremble for the purposes of wrecking. This concession by no means implies that she could lawfully remain there at all times and under all conditions of wind and weather. It does not imply that she could so chain herself down that she was as helpless as the wreck she was attempting to assist.

It is said that it was necessary for the Ben Hur to remain constantly at the wreck to keep the scow in position. I am constrained to doubt the accuracy of this proposition. The chains from the Tremble tended to hold the Algoma in place and in addition she was guyed to one of the Tremble's spars. If it were necessary to steady her still further it is difficult to see why she could not have been anchored precisely as was the Ben Hur. The Ben Hur, whether 150 or 300 feet from the shore was directly in the path of navigation. She occupied a most dangerous position. On a calm, clear night, or even in broad daylight, she was a menace to passing vesesls. To lie where she did on the night of the collision was unquestionably negligence. It was a dark, squally, and, as one of the witnesses expressed it, "a nasty night." The wind was blowing diagonally across the river at the rate of at least 10 miles an hour, and probably considerably more. The wind could not have come from a more dangerous quarter. Its tendency was to swing the tail of the tow, especially if the tow was light, directly across the river. In such circumstances it was inevitable that the last barge of the tow must be considerably to the west of the tug. In short, the situation was as well known to the libelant as to the master of the Passaic. He took the risk of leaving his vessel in a position of hazard on a dark and squally night when, without serious inconvenience, he could have moored her at the dock and begun operations again in the morning.

The only excuse for not doing this is that it would have taken time and trouble. Suppose it did: such considerations are not to be considered for a moment when valuable property, and even human life, are at stake. I am convinced that it was not necessary for the Ben Hur to be in the position she occupied at the time of the collision and that no sufficient reason has been suggested to justify her remaining there. The fact that it would have caused her some inconvenience to get into a position of safety is not worthy to be considered.

All of the ancient codes recognized the wisdom of dividing the damage where an anchored ship is struck by another driven by the wind or current. The rationale of the rule is quaintly stated in the Laws of Wisbuy, as follows:

"The reason is, that some masters who have old crazy ships, may willingly lie in other ships' way, that they may be damnified or sunk, and so have more than they were worth for them. On which account this law provides, that

the damage shall be divided, and paid equally by the two ships, to oblige both to take care, and keep clear of such accidents as much as they can."

But if it be assumed that the Ben Hur was rightfully where she was at the hour of the collision, there was surely no reason why she should so involve herself in a network of chains and cables that it was impossible to extricate her at the approach of danger.

The answer to the respondents' accusation that the Ben Hur should have done something when she saw the Superior swinging down upon her, is answered by the suggestion on behalf of the libelant that it was impossible to move the Ben Hur a single inch. Every effort was made, apparently, to hold the Ben Hur in the rigid embrace of her tackle, fore and aft, so that nothing could be loosened or made to budge, except after many minutes of arduous exertion. In other words, the libelant first makes the vessel helpless and then urges this condition as a reason why she did not help herself. It is like an engineer excusing himself for permitting his boiler to explode by the assertion that it was not possible to ease the strain upon it because he had previously locked down the safety valve.

If the Ben Hur concluded to assume the risk of lying out all night at such a time the least she could do was to adjust her tackle in such a manner that upon the approach of danger she could act at a moment's notice. Had the anchor chains been slackened, the stern lines thrown off and the wheel put a-starboard she would, in all probability, have drifted down stream and towards the freight dock sufficiently to avoid the collision altogether or materially to lessen its force. The Richmond, 56 Fed. 619, affirmed 12 C. C. A. 1, 63 Fed. 1020.

The use of the two anchors formed a dangerous pocket. That the Superior first struck the port chain appears to be clear from the testimony. It would seem that the starboard anchor might, for that night at least, have been dispensed with. But whether one or two anchors were out the chains should have been so arranged that they could have been slackened without the least delay. Instead of this they were weather-bitted around the windlass. I agree with one of the witnesses who says:

"If she were anchored with a bridle and they slacked up on the starboard bridle chain it would have put her into the dock very quickly or in towards the dock. If they had been looking for something of this kind and had been ready it would not have taken any time at all."

I see no way to avoid the conclusion that there was carelessness on the part both of the Passaic and the Ben Hur.

It follows that the libelant is entitled to a decree against the Passaic for half damages and costs and a reference to compute the amount.

As to the barges the libel is dismissed, with costs.