### THE ITASCA.

#### (District Court, S. D. Georgia, E. D. July 31, 1901.)

1. COLLISION—ANCHORED DREDGE AND PASSING STEAMER—IMPROPER ANCHORAGE.

A dredge anchored at night in a navigable channel of a river was sunk in collision with a passing steamer. Owing to her light draught, the dredge might readily and with little inconvenience have anchored further inshore in a place of safety, and she therefore violated the statute (30 Stat. c. 425) in taking the more exposed position. On the other hand, her lights were burning, and were seen by the steamer, the night was calm and bright, and there was ample room for the steamer to have passed at a safe distance. *Held*, that both vessels were in fault, and the damages should be divided.

2. SAME—DAMAGES RECOVERABLE.

The libelant in a suit for collision is not entitled to the allowance of an item of damages which was not claimed in the pleadings, nor while the testimony was being taken.

3. SAME.

The owner of a dredge injured in a collision is not entitled to recover as damages the salary paid his general superintendent in charge of his dredging work during the time the dredge was being repaired, where it appears that he attended to his regular duties in addition to overseeing the repairs.

4. SAME.

Evidence considered relating to the damages recoverable for injury to a dredge in collision, including cost of repairs, loss of time, etc.

5. SAME—INTEREST.

In a suit for collision, where both vessels are found in fault, and the damages divided, interest is not recoverable except from the date of final decree.

6. COMMISSIONERS IN ADMIRALTY—FINDINGS OF FACT.

Findings of fact by a commissioner in admiralty should be made, if practicable, in distinct paragraphs, numbered successively. Exceptions

---

¶ 1. See Collision, vol. 10, Cent. Dig. § 296.

of the parties and briefs of proctors should refer by number to such paragraphs. Precedents: Form 195, p. 331, 4 Desty, Fed. Proc.; form 490, p. 627, Id.

In Admiralty. Suit for collision.

Robert M. Hitch, for libelant.

Daniel H. Hayne and William Garrard, for claimant.

.SPEER, District Judge. The libel in this cause was brought to recover damages resulting from the sinking of the steam dredge Alabama by the steamship Itasca. The collision occurred in the Savannah river August 16, 1899. The questions involving the liability of the Itasca were submitted to the court, and were determined on the 8th of February of this year, when, on the conclusion of the argument, the following oral opinion was rendered:

"This cause has been argued very exhaustively, and for almost all of two entire daily sessions of the court. I stated in the outset to counsel that I would take the papers and examine the authorities, but the very exhaustive character of the arguments has rendered this unnecessary. There is no difficulty as to the law, and the evidence has produced in my own mind a conviction which is clear and satisfactory to myself, and therefore I think it proper that I should at once announce it. The libelants violated the law, in that the dredge anchored in a deep, navigable portion of the channel, in violation of the act of congress, approved March 3, 1899 (30 Stat. c. 425, § 15), when she could have been readily hauled out into water where the Itasca could not possibly have gone. This provision of the act of congress is very satisfactorily discussed in Hughes, Adm. p. 264. The Alabama might have obeyed it without inconvenience, delay, or other interference with her work at all proportionate to the security to be attained or the risk to be incurred by the neglect of this obvious duty. That the dredge remained in the actual, if not the official, channel, is plain enough, because, with her considerable draught, the Itasca struck her thēre without going aground, and the steamship Augusta, with her greater draught, passed in eight feet of her, after backing, without going aground, a considerable distance to the southward, —the direction in which the dredge should have been· moored. That this negligence of the Alabama contributed to the injury is not fairly questionable. On the other hand, all agree that the dredge had out her lawful, customary, and sufficient lights, indicating to the Itasca that she should pass to the northward, or port side. These lights were seen in good season on the Itasca, and were reported by the lookout. The Itasca, therefore, could readily have passed a sufficient distance to the northward to have avoided all possibility of collision. There was 220 feet breadth of channel on that side, in which she could have been safely navigated. There was no occasion, then, for the Itasca to go so near to the Alabama as to subject herself to the mysterious influence of an 'inscrutable cause,' which produced the 'unavoidable accident,' to which the proctors for claimant so earnestly ascribe the collision. Nor may I accept the theory that the Itasca was moved to sheer in an uncontrollable manner by a deep cut which the dredge had just made. The evidence is that the dredge was merely restoring a depth which had previously existed, and the theory of the respondent's proctor that the excavation and the deep water it produced caused this sheer is scarcely maintainable. There was but a trifling difference in the depth of the water in which the Itasca was pursuing her proper course and that she is said to have sought through unexpected physical forces resulting in a sudden and impetuous rush toward the Alabama. It is, on the contrary, plain that a proper exercise of caution by the people of the Itasca would have easily avoided the collision. The officer in charge was perfectly familiar with the river. The night was calm, clear, moonlit, and starlit. There was no wind, no obstacle in her way. The fault is that she failed to lay her course a·

sufficient distance to the northward of the dredge, and therefore incurred the danger of the collision which actually followed. I conclude that the fault was mutual, and about equally aggravated, and that the damages and costs should be apportioned between the respondent and libelant; in other words, that the libelant should recover half damages and half costs. The evidence having been taken, a further reference will be directed to ascertain the correct amounts."

A decree was taken in accordance with the views thus expressed by the court, in which it was also provided that a further reference be had to T. P. Ravenel, Esq., commissioner, "to ascertain and compute the amount of the total damages, and report the same to the court with all convenient speed." This reference having been made by the court of its own motion, the findings of the commissioner, while advisory and serviceable, have not precluded the necessity of an independent investigation by the court of all the facts essential to the proper computation of damages. The libelant has claimed the damages following: For raising the dredgeboat Alabama, for expenses incident to her repairs, and to damages for loss of time, aggregating 90 working days, $34,838.42. The total damages computed by the commissioner and reported to the court are $20,198.32. Both the libelant and claimant filed numerous exceptions, which they have attempted to support not only by comprehensive oral arguments, but written briefs. Unhappily, also, the commissioner and the learned proctors for the libelant and for the claimant have discussed the various topics in a different order,—a fact which has not contributed appreciably to their easy ascertainment.

Adopting, however, for the time, the order of the libelant's proctor, the first exception of the libelant is to the refusal of the commissioner to allow a claim of $150 for the use of the tug Turner for 15 days while she was assisting in raising the dredge. This finding is based upon the fact that the Turner was loaned or given to libelant by his father, and upon the further ground that no claim was made on this account in the pleadings, or while the testimony was being introduced. Had this item been brought to the attention of the claimant either by the pleading or in the introduction of testimony, it might well have been allowed. It does not matter to the claimant, to whom may belong the tugboat used to restore the values lost by his marine tort. He is none the less properly chargeable with the fair value of her services. The trouble as to this item, which the libelant cannot overcome, is that the claimant had no adequate notice of the demand, either in pleadings or proof, and it must therefore be denied.

Libelant's exception No. 2, which also involves claimant's exception No. 1, relates to the finding of the commissioner which charges the libelant with $200, or one-fourth of the total expense for dockage and "lay days" while the dredge Alabama was on a marine railway undergoing repairs. The libelant insists that this entire expense should have been borne by the claimant, and the claimant contends that one-half of $400 should have been charged against the libelant. The finding of the commissioner is based upon the fact that while the dredge was on the dry dock the libelant seized the opportunity to put a new bottom in her, which was not made necessary by the collision. This work had been contemplated by the libelant

long before the collision, and the necessary lumber purchased and stored for the purpose. Willink, the ship carpenter, testified that the bottom was worm-eaten, and that the sheathing had been entirely worn away. The libelant concedes that a new bottom was put in by himself, and that he had contemplated doing this work for some time, and had provided the lumber. When the work for the collision repairs commenced, the libelant states that neither he nor his superintendent knew that the bottom would have to come out on account of the damage done by the collision. They soon reached the conclusion, however, that the collision had occasioned the defective character of the bottom, and so the libelant filed an amendment demanding $1,421.50 for the cost of putting in the bottom. This was quite properly denied by the commissioner. The finding of the commissioner on this item is at least approximately correct, and, in view of the amendment of libelant on this point, and the evidence showing the expenditures chargeable to the collision and chargeable to the libelant's personal account, is regarded satisfactory. For the same reasons the exceptions of libelant and of the claimant to the finding of the commissioner which charged the libelant with $133.87, the same being one-fourth of the cost of the tug Turner and her coal during 17 days' service to the dredge while on the marine railway undergoing repairs, must also be overruled.

The commissioner finds that during the time the repairs were being made, E. W. Robinson, employed by the libelant, was superintending generally the repairs, and also putting in the new bottom, and also giving a general supervision to the entire dredging business of the libelant. The libelant, in view of these facts, insists that he should be paid by the claimant $375 for the entire salary of his superintendent for that period covering the repairs. The commissioner disallows this demand, and charges the claimant with one-fourth of Robinson's salary, amounting to $93.75. Both the libelant and the claimant except to this finding; the former urging his demand as above stated, and the latter insisting that the libelant is not entitled to claim anything on this account. On this exception we think the claimant is right. The superintendent was in the employment of the libelant before the collision. His salary was not increased. No other superintendent was employed while he was giving a general supervision to the repairs. It does not affirmatively appear that any loss to the dredging business of libelant resulted, because the superintendent was devoting the larger portion of his time to inspecting or directing the repairs of the Alabama. On this point we are unable to agree with the conclusions of the commissioner, and sustain the exception of the claimant.

Departing from the order of treating the exceptions heretofore pursued, it will be convenient to consider the next succeeding topics under the sixth exception filed by the claimant. This is that the commissioner erred in finding and allowing to the libelant damages for repairs in the sum of $11,368.76, the said allowance being excessive, and unsupported by the evidence. Under this general exception we may consider the following exceptions of libelant: That the commissioner deducted $102.65 from the bill of N. Paulsen, and

again $70.05 from the bill of Paulsen, $484.53 from Kehoe's bill, and $138.38 from Palmer's bill. Under the same general exception we consider the exceptions of claimant, as follows: Because the commissioner should have rejected the bills of Kehoe, and allowed reasonable prices, shown by the evidence to be sufficient, and because the commissioner should have rejected the bill of Paulsen for the same reason, and for the same reason should have rejected the bill of Palmer. This method brings under consideration the whole question of repairs to the machinery which were made necessary by the collision. It will be understood that this does not include $1,336.89, allowed by the commissioner for raising the dredge, or the bill of Willink, the ship carpenter, for $5,268.55, for woodwork rendered necessary by the collision. To these items the claimant has made no exception save as to dockage and lay days, which have already been disposed of. Subtracting from his figures this and other items, such as the hire of the Turner in September, $133.37, which has been already allowed, and Robinson's salary of $375, which has been disallowed, it is insisted by the claimant that the following bills for materials and supplies, to wit, those of Wm. Kehoe & Co., Estate of Paulsen, Palmer Hardware Company, J. D. Weed & Co., Vulcanized Fiber Company, John Rourke & Son, Savannah Foundry & Machine Company, L. Adler, Leo Frank, Standard Oil Company, Savannah Building & Supply Company, and Neal-Millard Company, aggregating the sum of $4,438.98, and also the pay rolls, time checks, and bill for labor, amounting to $1,629.27, making a total of $6,068.25, should be eliminated from the amount allowed by the commissioner, and the sum of $3,010.33 substituted therefor, as representing what would have been a proper finding in view of the evidence. With regard to the bill rendered by the estate of Paulsen for spikes, nails, tar paper, tar brushes, galvanized tacks, coal tar, etc., amounting in the aggregate to $1,386.62, from which the master deducts $172.70, there is much conflict in the testimony. The claimant, as before stated, contends that the entire bill should have been disallowed. The libelant, as stated, excepts to the disallowance made by the commissioner. This bill was paid in full by the libelant for a variety of articles used in the repair or reconstruction of the dredge. With regard to the bills of Kehoe & Co. and Palmer Hardware Company, which relate to machinery, it seems that the disallowance of one-fourth made by the commissioner is altogether arbitrary. Indeed, the commissioner states that these bills for repairs are of such a character it is difficult for him, from his want of knowledge of machinery, to arrive at a proper conclusion between the parties in this cause. An illustration of the difficulties which the commissioner encountered, and which also present themselves to the court, may be gathered from the following passage of the report:

"Kehoe, one of the witnesses for the libelant, states that a portion of the work done by Kehoe & Company and charged for in their bills was for work that belonged to repairs to hull. However, he does not state how much, and therefore the commissioner cannot select specific items from this bill to disallow and others to allow; but, from the necessities of the case, being satisfied that the bill is too large, the commissioner reduces it by taking off of the whole bill one-fourth, namely, $484.53."

For the same reason the commissioner also reduces by one-fourth the bill of the Palmer Hardware Company, to wit, in the amount of $138.38.

A familiar rule for the ascertainment of truth in the presence of irreconcilable conflict between witnesses for the contending parties is to accept the testimony of those witnesses who have the best opportunity of knowing the facts to which they testify, and the least inducement, from interest or other cause, to testify falsely. We have the testimony of several witnesses of this character. They are Rourke, Avery, Freiberg, and Ponder. The witness Rourke is a member of the firm of John Rourke & Son, of Savannah, which owns and operates a large establishment for the repair of steam vessels, and particularly marine engines. The witness Rourke is general manager of this firm, and has been engaged in repairing dredge and other vessels for many years. If he has an interest in the outcome of this case, it does not appear. Avery is a practical engineer, machinist, dredgeboat captain, and builder of dredgeboats and tugs, has been master and engineer of a dredge, has had large experience, which is set out in the evidence, and is also disinterested. Freiberg was a witness for libelant, and, with Louis Wiggins, port warden, made a survey and examination of the dredge, lasting from September 19th to 28th, while it was on the marine railway. Ponder is a practical machinist. He was employed by Kehoe & Co. to do this work. Avery and Rourke read over the testimony of the witnesses for the libelant, examined the bills of Kehoe, and other bills relating to the machinery work, with great care, went to Charleston and inspected the dredge itself, made up an estimate of the cost of taking out the machinery after it was submerged, cleaning it, and putting it back, and all necessary repairs. All of these witnesses agree that it might have been done for the sum of $1,650. This Rourke regards as a very liberal estimate, and Avery states that this amount covered everything, including breakages, and taking apart and putting together machinery, etc. This testimony is supported by the survey made by Wiggins and Freiberg. The commissioner states in his finding that Ponder testified positively that the sum of $900 of the Kehoe bills was not necessarily expended on account of the collision, but was caused by general improvement of the machinery of the dredge. This proctor for claimant insists is an underestimate of the amount which Ponder testified was expended for general improvement; that it was $1,005.11. The testimony of Ponder is given full credence by the commissioner, and, as he was the machinist who did the work, it seems to possess much importance, and by comparing his testimony with the testimony of Avery and Rourke it is found that the items he rejects as not attributable to the collision were those which Rourke and Avery had marked doubtful. Kehoe himself testifies that he furnished material and did a lot of work for the libelant on the hull and woodwork. This was in his account, but could not be properly chargeable to the collision, because the contract for repairs to the hull and woodwork was in Willink's hands, and, as we have seen, no contest was made about it. In view of the very unsatisfactory and indefinite character of the proof which

the testimony of the libelant's witnesses affords upon the items involving the repairs to the machinery and involved in the bills of Kehoe, the Palmer Hardware Company, and similar bills, it is deemed safer to be guided by the testimony of Avery and Rourke, of Wiggins and Freiberg, and of Ponder and Kehoe, as above quoted. This will result in the rejection of the claim made for the bills paid to the Paulsen Estate, Kehoe, and the Palmer Hardware Company, and others similarly situated, and the substitution of the estimate made by Rourke, Avery, and the other witnesses. This conclusion may not be precisely accurate, but it is the best the court can do in view of the uncertainty of the evidence, and is preferable to the fixation of an arbitrary proportion, to be subtracted. In other words, in view of all the evidence, we prefer to accept the testimony of the expert and disinterested machinists and surveyors, who went over all the items, and furnished estimates, rather than hazard a guess as to how much work was done on the machinery, and how much material was furnished for the repairs, and how much for the large amount of improvement properly chargeable to libelant.

The ninth exception of libelant is based upon the fact that the commissioner refused to allow libelant's claim of $1,421.50 as cost of the new bottom to the Alabama. This finding was manifestly proper, as appears from the facts hereinbefore stated.

The tenth exception is because the commissioner refused to allow any compensation for demurrage on account of the lost time of the dredge Alabama during the month of December, 1899. This exception is based upon the fact that the new machinery put in by the libelant did not, at first, work well. It will suffice to say that these facts are too uncertain and indefinite to afford any basis for the just estimation of damages, if any were thereby sustained. Besides, the entire value of this dredge was only $20,000. She was submerged in shallow water. She was raised within a short time, and repaired. Libelant is entitled to restitutio in integrum, and nothing more, and it seems unreasonable to conclude that the repairs to the coarse and simple machinery of the dredge under the circumstances amounted to $11,368.76. There are several items which create mistrust as to the exactitude of the figures afforded by libelant's witnesses. For instance, the charge of $1,629.27 for the pay roll of the crew and labor. It is true that the libelant was probably obliged to continue the wages of his crew during the period in which the repairs were being made. It is doubtless true that he employed additional labor. It is, however, unreasonable to conclude that doing work on his own account, and having other dredgeboats, that he permitted his crew to remain in idleness, or that he expended without any return whatever anything like the sum stated for their wages and for labor. Certainly, if we may accept the testimony of libelant's witnesses, a most unwarrantable time was consumed in taking mud from the dredge, especially when it is understood that her bottom, bow, and stern were taken out altogether. Applying to the consideration of this charge the teachings of ordinary experience, and ascribing to the libelant the usual regard to his interest which men having laborers employed would exert, it is clear that he must have received such valuable

services on his own account from the work of the crew and the other laborers employed during the period of the repairs as will justify the court in reducing the allowance on this item by one-half. If he did not in fact utilize the services of the crew, it was his own fault. We are strengthened in this conclusion when we reflect that experts testified that the mud could have been removed from the dredge for the sum of $128. It seems impossible to arrive at any other satisfactory basis of estimating the cost of the repairs than that we have adopted, and largely for the reason that the libelant, for the general purposes of improving his dredge, has so complicated the calculation by the intermixture of innumerable items which appear from the 1,500 pages of testimony in such manner that it is impossible to say whether or not they were necessary for the repairs. This will reduce the finding of the commissioner on these items from $11,368.76 to $9,511.47.

To the finding of the commissioner with relation to the demurrage both sides except; the libelant because the commissioner did not base his finding upon the market value of the daily hire of the dredge, and the claimant upon the ground that he made an error in the number of working days. It, however, appears that no market value for the dredge was ascertained. On the other hand, there seems to be no good reason to discredit the finding of the commissioner as to the number of working days. He has laboriously and carefully estimated the sum which should be allowed on this account, and it appears to be, under all the circumstances, reasonable and just. The dredge, at the time she was sunk, was actively engaged on a contract with the government in the improvement of the channel of the Savannah river, which would have lasted for a much longer period than that covered by the stoppage resulting from the collision. The commissioner estimates the amount of her earnings by taking the average months of July, 1899, and February and March and April, 1900, and, dividing the amount of profits for those four months by the number of working days, he finds the average net profits to be $82.37 per day, and, multiplying this amount by the number of days detention, to wit, 91 days, he ascertains $7,495.67, which he allows as compensation for the time lost to libelant while he was deprived of the use of his dredge by reason of the collision.

An additional exception is filed by the libelant because the commissioner did not allow interest. This question he left for determination by the court. Upon this subject it will suffice to say that in the decision on liability the court held the parties jointly at fault, and therefore jointly liable for the damage. In cases of mutual fault, the amount, proportion, and extent of which must necessarily be determined by judicial proceedings, interest cannot be charged for the period covered by such proceedings. It follows that in this case interest cannot be allowed except from the date of the final decree which will be filed in accordance with this opinion.

In view of the great complexity of this record, the innumerable disallowances and exceptions, for a clearer understanding of the conclusions reached the following summary is made:

### Summary.

(1) For raising the dredge, and expenses incident thereto....... $1,336 89
(2) For cleaning and repairing dredge, etc.

| Items. | Claimed. | Allowed by Commr. | Allowed by Court. |
|---|---|---|---|
| Port Wardens .............. $ | 30 00 | $ 30 00 | $ 30 00 |
| Est. of Paulsen..... $1,386 62 | | | |
| Wm. Kehoe & Co... 1,938 25 | | | |
| Palmer Hardware Co. ............ 553 52 | | | |
| Weed & Co......... 59 02 | | | |
| Vul. Fiber Company 10 00 | | | |
| Rourke & Son...... 29 70 | | | |
| Sav. Foundry & M. Co. ............ 273 41 | | | |
| Adler ............. 55 14 | | | |
| Frank ............. 42 90 | | | |
| Standard Oil Co..... 32 93 | | | |
| Neal-Millard Co. ... 54 85 | | | |
| Sav. Bld. & Sup. Co. 3 00 | | | |
| | $ 4,439 34 | $ 3,643 73 | $2,882 33 |
| Pay rolls and labor.......... | 1,629 27 | 1,629 27 | 814 63 |
| E. W. Robinson.............. | 375 00 | 281 25 | 000 00 |
| W. J. Moore................. | 20 00 | 20 00 | 20 00 |
| Seaboard Contracting Co...... | 28 00 | 28 00 | 28 00 |
| Freiberg .................... | 35 00 | 35 00 | 35 00 |
| Kelly & Sons................ | 18 75 | 18 75 | 18 75 |
| Silva ...................... | 78 | 78 | 78 |
| Willink ..................... | 5,268 55 | 5,068 55 | 5,068 55 |
| Tug Turner ................. | 500 00 | 366 13 | 366 13 |
| Coal for Turner............. | 130 00 | 130 00 | 130 00 |
| Coal lost on Alabama........ | 81 25 | 81 25 | 81 25 |
| Refrigerator ............... | 38 00 | 38 00 | 38 00 |
| | $12,593 94 | $11,370 71 | $9,513 42 |
| Error reported by Commr... | 1 95 | 1 95 | 1 95 |
| | $12,591 99 | $11,368 76 | $9,511 47 | $ 9,511 47 |

(3) Demurrage as reported by commissioner and allowed by the court ...................................................... 7,495 67

Total......................................................... $18,344 03

From these figures it will appear that the total amount of damages resulting to the libelant from the collision of the Itasca with the dredgeboat Alabama and the sinking of the latter is found to be the sum of $18,344.03. The libelant being equally at fault, and therefore only entitled to recover one-half of this sum, will be allowed to enter a decree for the sum of $9,172.01½.

The court will add that the perplexing and extended labor which has been encountered in the determination of the innumerable issues of this cause would have been greatly diminished, and its duty not only simplified, but the conclusion made more satisfactory, had the findings of the commissioner been made in a sufficient number of distinct paragraphs successively numbered, and had the exceptions of the respective parties and the briefs of their proctors likewise related to such paragraphs, and in the order presented by the commissioner's report. A precedent for a commissioner's report may be found in

form 195, p. 331, 4 Desty, Fed. Proc. This requires the commissioner to state a résumé of facts, which was not done in this case. But this method would be additionally very much improved if the findings of the facts should be reported in numbered paragraphs, as required with relation to a report of a master in chancery. See form 490, p. 627, Id.

## THE YUMA.

### (District Court, W. D. New York.    September 4, 1902.)

1. COLLISION—VESSELS MEETING—STEAMER AND SCHOONER IN TOW.
    Evidence considered, and *held* to show that a steamer passing up the St. Clair river and a schooner coming down in tow were both in fault for a collision in which the schooner was sunk,—the steamer for sheering to starboard, toward the course of the schooner, after passing the ship having the latter in tow, and in failing to take timely action to keep at a greater distance after the exchange of passing signals, which she might safely have done; and the schooner for the same reason, it appearing that she did not promptly change her course, as did the steamer having her in tow, which was exonerated from fault.

In Admiralty.    Suit and cross-libel for collision.

Goulder, Holding & Masten, for libelants.
Shaw, Waite, Cady & Oakes, for claimant and respondent.