THE CITY OF BIRMINGHAM.

OCEAN S. S. CO. OF SAVANNAH v. P. SANDFORD ROSS, Inc.

(Circuit Court of Appeals, Second Circuit, May 6, 1905. On Rehearing, June 2, 1905.)

Nos. 186, 187.

1. COLLISION—STEAMER AND ANCHORED DREDGE—NEGLIGENT NAVIGATION.

A steamer passing up the Savannah river at night, when 2,300 feet away, saw the lights of a dredge, which indicated that she was anchored to the south of the center of the channel, and that vessels should pass to the northward of her. The night was clear and still, the tide ebb, and there were no unusual conditions to prevent the steamer from keeping on the right-hand side of the channel, where there was 500 feet of deep water north of the dredge and unobstructed; but she failed to make allowance for the effect of the tide, and kept to the south of the range line, coming into collision with the dredge and sinking her. *Held*, that the steamer was clearly in fault.

2. SAME—ANCHORING DREDGE IN NARROW CHANNEL.

A dredge, anchored at night within 200 feet of the center of the narrow channel of the Savannah river, at a point not far above a sharp bend, and where a 7-foot tide ebbed and flowed, was struck and sunk by an ascending steamer. The dredge was of light draft, and could have anchored in a place of safety entirely outside the channel; the only reason given for not doing so being the inconvenience of moving from the place where she was working. *Held*, that such anchorage obstructed the passage of other vessels, in violation of section 15 of Act March 3, 1899, c. 425, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], and that the dredge was chargeable with contributory fault for the collision.

Appeals from the District Court of the United States for the Eastern District of New York.

For opinion below, see 125 Fed. 506.

On appeal from a final decree of the District Court for the Eastern District of New York, holding the steamship City of Birmingham solely at fault for the sinking of Dredge No. 7 in the Savannah river on the morning of April 15, 1902. A cross-libel by the Ocean Steamship Company, owner of the City of Birmingham, against P. Sandford Ross, Incorporated, owner of the dredge, was dismissed. On March 23, 1904, final decree was entered against the City of Birmingham for damages and costs in the sum of $32,688.42 and against the Ocean Steamship Company in the second action for $30.70 costs. The steamship company appeals to this court.

Charles S. Haight, for appellant.

R. D. Benedict, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. The salient facts have been carefully collected and concisely stated by the district judge. It is unnecessary to repeat them.

## The Steamship.

The negligence of the steamship is clearly established. No difficult problem of navigation confronted her. The night was clear, there was no wind, the tide was ebb, a deep navigable channel in the center of the river was free from all obstructions, and to the north of the range line there was good water for more than 400 feet; no vessel was approaching and the lights on the dredge and the range lights on the shore were all set and burning. The steamship was proceeding up the river to the city of Savannah over a perfectly well known course, her master having been 30 years on the Savannah line. There were no unusual conditions, either external or on board the ship, to contend with. She knew that the dredge was anchored south of the center line of the channel and if she had followed the elementary rules of navigation, namely, gone to the right and north of the center line, she would have passed safely with ample space to spare. There were undoubtedly some difficulties in making the turn at the Oyster Bed, which will be considered later in discussing the conduct of the dredge, but there was nothing which could not have been readily met and surmounted by the exercise of ordinary skill and prudence.

It would be an extraordinary proposition that a steamer whose deepest draft is 15 feet 5 inches can be held blameless for colliding with an anchored dredge, which she should pass port to port, when there is nearly 500 feet of water, 22 feet deep, on the port side of the dredge, the situation being seen and understood when the steamer is half a mile distant.

It is argued that the sweep of the ebb tide renders it difficult to swing a vessel to starboard after making the turn at the Oyster Bed. This is true, but it is not unusual. Such situations are constantly encountered in the navigation of rivers and narrow channels where the tide ebbs and flows. An experienced mariner has no difficulty in dealing with such conditions.

The initial fault of the Birmingham was in making the turn so close to Buoy No. 9. The chart shows this buoy about 300 feet south of the range line. The steamer should have been on the range or north of it and yet she turned with the buoy on her port hand only 40 feet distant and never thereafter got to the northward of the range, or on the range, or even northward of the dredge. The dredge was reported before the steamer reached Buoy No. 9. The distance from this buoy to the dredge was 2,350 feet. The moment the master of the steamer saw the green light under the three white vertical lights he knew, first, that they were the lights of a dredge; second, that the dredge was stationary; third, that she was anchored south of the center of the channel; and, fourth, that he was required to pass to the northward. Knowing all this and also that the tide might sheer his bow to the southward it would seem to be his manifest duty to guard against danger by keeping as far north as possible in making the turn; certainly no justification is shown for making the turn so far south of the range line. It is said that he could not know the precise location of the dredge. Assuming this to be true he certainly could approximate it very closely, for in addition to the facts already stated he had the red lights on the Oyster Bed and Long Island to aid him. He testifies as follows:

"When I was at Buoy No. 9, as I turned that the green light of the dredge was open to starboard of the red light on Long Island. Looked so to me. * * * Looked as though it was open to the northward, to the starboard."

How could any plainer directions have been imparted? If he kept on with the green light opened to starboard he would disregard the signal, disobey the local rule and either run his vessel aground or pass to the south of the dredge. If he got the green and red light directly in range and kept on he would surely end in a head-on collision. If he opened the green light a little to port he would obey every rule of navigation and pass in perfect safety. This he did not do. He never opened the green light to port and was never in a position to pass the dredge to the northward. He did those things which he ought not to have done and he left undone the one supreme thing which he should have done. Before reaching Buoy No. 9 and after making the turn he should have kept on the range or north of the range. No sufficient reason is given for not doing so.

## The Dredge.

The testimony is so conflicting that it is impossible to fix the exact location of the dredge before the accident, but after she sank her position was located with substantial accuracy. She was 90 feet long, 34 feet beam and drew 8½ feet forward when coaled. Prior to the collision she was heading down stream. After the collision she lay almost at right angles to her former position, with her bow 90 feet and her stern, of course, 180 feet from the range or center line of the channel. She sank where the river was between 18 and 19 feet deep at mean low water. The blow was delivered on the starboard bow of the dredge, the tendency being to turn the bow towards the center of the river. The starboard breast line

was broken by the impact, but the starboard quarter line held. It is, therefore, improbable that the stern of the dredge was pushed for any considerable distance towards the center of the river.

We cannot resist the conclusion that if the bow of the dredge as she lay on the bottom of the river had been turned so that she was parallel with the range line, her distance from the line would then have approximated closely to that distance prior to the collision. If the momentum of the steamer merely turned her about with the stern line as a pivot it is clear that she could not have been more than 150 feet from the line. But the steamer was headed about northwest and being over three times the length of the dredge and moving at a speed sufficient to cut through the heavy bow timbers of the latter, the presumption is almost conclusive that she must have pushed the dredge ahead of her in the direction in which she was moving. Indeed, it is hardly disputed that the dredge was moved in a northwesterly direction between 25 and 30 feet. It is true that the tide may have driven her back a short distance before she finally settled on the bottom, but we think it is safe to say that the dredge before the collision was 25 feet farther south from the range line than was the sunken wreck if placed in the position indicated above. The district judge found that the dredge was about 200 feet south of the center line of the channel and we are satisfied that this conclusion is substantially correct. The overwhelming weight of testimony establishes the fact that she could not have been nearer than 150 feet to the center line, or farther than 225 feet from it, and we think this finding sufficiently presents the remaining question, namely, was the dredge at fault in anchoring where she did?

The Savannah river is a narrow, winding stream where a seven-foot tide ebbs and flows. One of the sharpest and most difficult turns is at the Oyster Bed, especially when the tide is ebb, as an ascending vessel receives the full force of the current alternately on her port and starboard bow. The danger is enhanced at night owing to the insufficiency of the ranges and the necessity for reduced speed which increases the liability to sheer. The dredge was moored by means of a central spud and five lines extending to anchors several hundred feet distant. One of these lines extended directly back from the stern and there were two lines on each side, one extending laterally from a point a few feet aft of the bow and the other a few feet forward of the stern. When these lines were taut the dredge occupied practically the entire channel and even when slackened and weighted they were a menace to navigation, sometimes being drawn taut by the action of the elements and fouling the propellers of passing steamers. It is conceded that the dredge, being of light draft, could have removed entirely from the theatre of navigation, beyond the limits of the channel made by the 18-foot curves, and anchored at a point where no deep-draft vessel could reach her. The possibility and the feasibility of such a course is admitted, but it is said that it would have consumed time and would have been inconvenient. It is argued that article 25 of the rules for preventing collisions requires steam vessels

in narrow channels, when safe and practicable, to keep to the right of the center line of the channel, and that the dredge was justified in supposing that she was anchored where vessels coming up the river could not reach her. It seems to us that this contention leaves out of view the important consideration that vessels were going down as well as coming up the river and that they, too, were directed by the signal lights to pass to the north of the dredge. Thus by blocking several hundred feet of navigable water to the southward the dredge limited by so much the space in which to maneuver and, in case of meeting vessels at that point, increased immensely the chances of collision.

The act of March 3, 1899, c. 425, 30 Stat. 1152, § 15 (U. S. Comp. St. 1901, p. 3543), provides "that it shall be unlawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." It seems to us that a dredge anchored at night 200 feet from the center of the channel of a narrow river, where a seven-foot tide ebbs and flows and within half a mile of a sharp bend, is within the mischief if not within the strict letter of the statute. Such a craft does not prevent navigation in the sense of stopping it altogether, but by crowding all navigation practically into the northern half of the channel she obstructs the passage of other vessels; that is, she hinders, impedes, embarrasses and interrupts their progress. We are not dealing here with the case of a vessel anchored in a wide, straight channel, where there is ample room to pass on either side. In the John H. Starin, 122 Fed. 236, 58 C. C. A. 600, we had such a situation under consideration and, though we did not decide that it was negligence per se, we did hold that the precautions taken by a vessel anchoring in a dangerous position should be commensurate with the perils assumed. The Clara, 102 U. S. 200, 26 L. Ed. 145; The Sapphire, 11 Wall. 164, 170, 20 L. Ed. 127.

The navigation of the Savannah river above the Oyster Bed at night was difficult enough in any circumstances. Placing the dredge within 200 feet of the center line added a new and wholly unnecessary complication to a problem already sufficiently perplexing. The courts should not encourage laxity and shiftlessness by rewarding a master who places his craft in a position of danger simply because it is too much trouble to place her in a position of safety. Where human life and property are at stake, the consequences flowing from a dereliction of duty are so momentous that the courts should not permit considerations based upon convenience alone to be used as an excuse by one who has failed to take every reasonable precaution to insure safety. A finding in favor of the dredge will place a premium on carelessness. Those having such craft in charge will hardly deem it necessary to take the trouble to move them to places of safety. Indeed, it is not easy to see how, in such an event, it will be possible, hereafter, to find a dredge in fault even though she anchors directly on the center line so long as half the channel is left open. The argument is identical, differing only in degree, whether the dredge be on the line or 100 or 200 feet distant from it. We are of the opinion that, in

the circumstances disclosed, a dredge must show some controlling reason for monopolizing the navigable water of the channel.

The foregoing views are in accord with the following authorities: In The Milligan (D. C.) 12 Fed. 338, the court says:

"That each party was in fault, I have no doubt—the sloop for lying at anchor where she did, the bark and tug for failing to keep off. While the sloop was not lying upon the range of lights, she was dangerously near it,—subjecting passing vessels to the exercise of unusual care. The position was not forced upon her; she might have anchored lower down (before reaching it, or by floating back when the tide turned). She would thus have been out of the way, and out of danger. Her anchorage so near the centre of a narrow channel was inexcusable."

In The Itasca (D. C.) 117 Fed. 885, the collision occurred between a steamer and a dredge in the Savannah river. The syllabus is as follows:

"A dredge anchored at night in a navigable channel of a river was sunk in collision with a passing steamer. Owing to her light draught, the dredge might readily and with little inconvenience have anchored further inshore in a place of safety, and she therefore violated the statute (Act March 3, 1899, 30 Stat. 1152, c. 425 [U. S. Comp. St. 1901, p. 3543]) in taking the more exposed position. On the other hand, her lights were burning, and were seen by the steamer, the night was calm and bright, and there was ample room for the steamer to have passed at a safe distance. Held, that both vessels were in fault, and the damage should be divided."

See also as bearing on the question involved the following: Strout v. Foster, 1 How. 89, 11 L. Ed. 58; The Maling (D. C.) 110 Fed. 227, 236; The Banan (D. C.) 116 Fed. 900; The Passaic (D. C.) 76 Fed. 460.

We have examined the assignments of error disputing the correctness of the assessment of damages and are of the opinion that there was no error in allowing interest and demurrage and that the amount awarded is not excessive.

It follows that the decree must be reversed, with costs in this court (The America, 92 U. S. 432, 23 L. Ed. 724) and the cause is remanded to the District Court with directions to apportion the damages and the costs in that court equally between the respective vessels.

On Rehearing.

PER CURIAM. The application for a hearing is denied. We are unable to perceive that the petition suggests any proposition which was not carefully considered.

We do not feel justified in certifying the question, regarding Act March 3, 1899, c. 425, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], as requested, for the reasons:

First. It is not a question concerning which we desire the instruction of the Supreme Court. We entertain no doubt as to the proper construction of the statute.

Second. Were the question answered in the negative, it would not change the result. Irrespective of the statute, the dredge was at fault in anchoring where she did at night, when there was nothing to prevent her from removing to a position where it would have been impossible for steamers to have reached her.